**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: March 31 2011**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 10-33796 |
| | ) | |
| Anthony L. Henderson and | ) | Chapter 7 |
| Kimberly Henderson, | ) | |
| | ) | |
| Debtor. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER
### REGARDING MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 25] and Debtors' response [Doc. # 29]. The court held a hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the briefs and arguments of counsel and having reviewed the record in this case,

for the reasons that follow, the court will grant the UST's motion and will dismiss Debtors' Chapter 7 case unless they timely convert it to a case under Chapter 13.

## BACKGROUND

Debtors are married and have three children, ages twelve, sixteen, and eighteen. Debtors' oldest son attends Bowling Green State University. Anthony Henderson ("Henderson") is employed as an inspector for Chrysler Group, LLC, where he has worked for twelve years. Kimberly Henderson is a correction officer lieutenant with the State of Ohio/Toledo Correctional Institution, where she has worked for ten years.

On October 12, 2010, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts. Debtors' Schedule D shows total secured debt in the amount of $303,891. Their secured debts include $128,774 secured by a first mortgage and $21,984 secured by a second mortgage on their home, which they value at $108,500, and $15,622 secured by their 2009 Chrysler Sebring. Also included are the following debts secured by rental property in Toledo that is owned by Debtors: $66,856 on property located on Ranch Drive ("Ranch Property"), which Debtors value on Schedules A and D at $55,000,[1] a total of $38,655 secured by a first and second mortgage on property located on Waverly Avenue, ("Waverly Property"), which Debtors value at $25,000, and $32,000 secured by a first mortgage on property located on Coventry Avenue ("Coventry Property"), which Debtors value at $25,000. [UST Ex. 3, pp. 3, 9-10]. Debtors' bankruptcy schedules, as amended, also show unsecured priority debts in the amount of $4,717, of which $75 is for unpaid property taxes and the balance for unpaid state and federal income taxes, and unsecured nonpriority debts in the amount of $53,012, consisting primarily of credit card debt. [UST Ex. 3, pp. 12-17; Ex 6, p. 4; and Ex. 7, p. 4].

Debtors have stated an intention to surrender the Waverly Property, which is unoccupied and, because it has been vandalized, cannot be rented. Henderson testified that Debtors intend to continue paying the mortgages on their home and the rented properties, which include the Ranch Property and the Coventry Property, but do not intend to reaffirm the debts secured by any of the properties that they own. For the Ranch Property, Debtors receive rental income of $800 per month and incur a mortgage and property tax expense of $630. According to Henderson, the property is fairly maintenance free and maintenance expenses are only approximately $25 per month. Although there is a duplex on the Coventry Property, Debtors have only one tenant there who is paying $250 to $300 per month, which amount Henderson testified does not cover the mortgage and maintenance expenses for the property. The court notes that relief

---

[1] At the hearing, Anthony Henderson testified that the Ranch Property value is approximately $40,000.

from the automatic stay and abandonment was granted as to that property on August 26, 2010. [*See* Doc. ## 16 and 22].[2]

Debtors' Amended Schedule I shows gross monthly wages in the combined total amount of $8,818.87 and net monthly wages after payroll deductions in the combined total amount of $5,811.81. [UST Ex. 7, p. 5]. Deductions from Henderson's pay include $610 per month in child support payments. According to Henderson, the child for whom he is paying support is 16 ½ years old and support payments will cease at age eighteen. Although he was previously contributing to a 401(k) plan, Henderson stopped those contributions after commencement of this case. Deductions from Kimberly Henderson's pay include $86.66 as a voluntary contribution to an Ohio Deferred Compensation account. Debtors' Schedule I also shows rental income of $800 for the Ranch Property, resulting in total income after payroll deductions of $6,611.81 [*Id.*]. Henderson testified that he has experienced periods of unemployment due to layoffs in the past. Nevertheless, Debtors anticipate gross income from wages of approximately $101,000 in 2010 as well as in 2011. In 2009, Debtors earned a combined total of $91,011 from wages and, in 2008, they earned $103,822. [UST Ex. 3, p. 25].

Debtors' Schedule J shows total monthly expenses of approximately $6,546. [UST Ex. 7, pp. 7-8]. Those expenses include a mortgage expense of $1,224 for Debtors' first mortgage on their home. Not included on Schedule J, however, is a $244 expense for the second mortgage on their home. Debtors testified that they are current on both their first and second mortgage. Debtors' expenses also include approximately $221 as payment of federal and state income taxes. Debtors indicate, however, that their income tax debt will be paid in twenty-four months. Other expenses include a $631 mortgage expense for the Ranch Property, $180 for cell phones, $1,000 for food, $150 for personal hygiene, $300 for clothing, $250 for home maintenance, a transportation expense of $570, as well as $200 for auto maintenance and $217 for auto insurance, and a total of $135 for Direct TV and cable television.

With respect to Debtors' monthly transportation/auto expenses, which total $987, Henderson testified that those expenses include gas and insurance expenses for their son who is attending college. Henderson also testified that Debtors' cost for auto maintenance in 2010 was only $800, which is an average of approximately $70 per month, or $130 less than the $200 stated on Schedule J. In addition, Henderson

---

[2] The court takes judicial notice of the contents of its case docket. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

testified that the cable television expense on Schedule J is overstated by $60. Correcting the auto maintenance and cable television expenses and deducting Debtors' second mortgage expense, their monthly income after expenses is currently $11. Henderson testified, however, that Debtors anticipate an expense of approximately $5,000 to fill in a swimming pool in their yard that is caved in and a dental expense of between $2,000 and $3,000 for braces for their youngest son.

In addition to their home and their rental properties, Debtors' assets include two vacant lots valued at $1,500 each but little or no other prepetition non-exempt assets. Since filing their petition, Henderson testified that he has purchased two older model vehicles, one for himself and one for his oldest son, with money he has saved.

Debtors' Form B22A calculating the means test shows that their annualized current monthly income at the time of filing this case was above the median income for a household the size of Debtors in Ohio. According to Debtors' means test calculation, no presumption of abuse arose under 11 U.S.C. § 707(b)(2). The UST filed a motion to dismiss for abuse and is now proceeding only under § 707(b)(3).

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

In this case, the UST does not argue that Debtors filed their petition in bad faith but instead contends

4

that the totality of their financial circumstances demonstrates that they are not needy and that granting them a discharge would be an abuse of the provisions of Chapter 7. The totality of the circumstances test allows the court to consider both prepetition and postpetition circumstances. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker,* 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007).

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126. As the movant, the UST carries the overall burden of demonstrating, by at least a preponderance of the evidence, that the Debtors' case should be dismissed. *In re Tucker*, 389 B.R. 535, 538 (Bankr. N.D. Ohio 2008).

In this case, Debtors are eligible for Chapter 13 should they choose to seek such relief. Notwithstanding Henderson's testimony regarding the periods of unemployment that he has experienced in the auto industry, Debtors currently are individuals with regular and sufficiently stable income and their debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). Both Debtors have worked for their current employer for over ten years. To the extent that Debtors seek relief under Chapter 13 and their financial circumstances substantially change for the worse at some time in the future, they would have additional options at that time, such as modification of their Chapter 13 plan under § 1329, a hardship discharge under § 1328, or reconversion to Chapter 7.

As discussed above, Debtors' monthly income after payroll deductions and adjusted monthly expenses totals only $11. Nevertheless, provisions under Chapter 13 offer relief to financially distressed debtors, such as cram down of certain undersecured debts and stripping off a totally unsecured mortgage

5

on their home under the authority of *In re Lane*, 280 F.3d 663 (6th Cir. 2002). Debtors in this case are currently paying on a second mortgage on their home that, according to Debtors' valuation on Schedule D, is totally unsecured. Stripping off the second mortgage would add approximately $22,000 to their unsecured debt, but would also relieve them of the second mortgage payment of $244 per month. These funds could then be used to make a pro rata distribution to all of their unsecured creditors, including their second home mortgage creditor, through Chapter 13. Debtors' valuation of their rental properties on Schedule D also show that each of those properties are undersecured. If they retain the Ranch Property as Henderson testified they intend to do, the cram down provisions of § 1325(a)(5) could possibly make even additional funds available to repay unsecured creditors.

Also, Debtors' Schedule J expenses include $221 as payment of unsecured priority debt for state and federal income taxes owed by them. Because unsecured priority debt must be provided for in a Chapter 13 plan, those funds would be applied to fund their Chapter 13 plan. If only this $221 plus the $244 that would be available by stripping off the second mortgage on Debtors' home is applied to repay unsecured creditors over the sixty-month maximum plan duration for above-median income debtors, *see* 11 U.S.C. § 1322(d)(1), Debtors would have approximately $25,807 available after payment of the Chapter 13 Trustee's administrative expenses to pay their unsecured debt. Henderson, whom the court found to be a knowledgeable, thoughtful and credible witness, acknowledged as much, testifying that Debtors "could possibly afford" monthly payments in the $400-$500 range.

Assuming Debtors' unsecured nonpriority debt includes the approximately $22,000 unsecured second mortgage on their home as well as the $53,013 in unsecured debt set forth in their Schedule F, as amended, their unsecured nonpriority debt totals $75,013. As Debtors' schedules show unsecured priority debt in the amount of $4,717, unsecured nonpriority creditors may potentially receive a dividend of approximately twenty-eight percent, or more if claims are not filed by all creditors as frequently occurs. *See In re Behlke*, 338 F.3d at 437 (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors). And to the extent that Henderson's $610 monthly child support payment is also applied to fund a Chapter 13 plan after his son reaches the age of eighteen and such payments cease, unsecured creditors may receive an even greater return.

While Debtors may be facing certain additional expenses not accounted for above, such as for filling in their swimming pool and orthodontic expenses for their son, the court believes that further tightening of their financial belt is possible. For instance, Debtors transportation and car expenses as adjusted above total

6

over $850 and include payment of gas and auto insurance for their eighteen-year-old son. It is the court's expectation, however, that Debtors' children would contribute to payment of the added cost of insurance if they will be driving family vehicles. The court thus finds that such additional expenses are not necessary for the maintenance and support of Debtors or their dependents. Other monthly Schedule J expenses, such as $180 for cell phones, $150 for personal hygiene, $300 for clothes, $250 for home maintenance, and $1,000 for food, also leave room for some financial belt tightening that could make additional funds available to Debtors. That this is possible is demonstrated by Debtors' ability to purchase two vehicles, albeit older model vehicles, with money saved after filing their bankruptcy petition.

The availability of debtors' remedies under state law and the relief that might be afforded through private negotiations are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. Neither party has addressed these factors in this case. As the United States Trustee bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N.D. Ohio 2007), the court will assume that there are no such state law remedies or private negotiations that will assist in resolving Debtors' financial problems.

In sum, the court finds that Debtors have reasonably stable income and are able to pay a meaningful portion of their unsecured debts out of their future income without Debtors or their dependents being deprived of adequate housing, food, clothing, or other necessities and that granting Debtors relief under Chapter 7 of the Bankruptcy Code would, therefore, be an abuse of the provisions of that chapter given the totality of their financial circumstances.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the United States Trustee's motion to dismiss [Doc. #25] will be granted, and this case will be dismissed, by separate order of the court.

7